1
2
3
4
5

**MAGNANIMO & DEAN, LLP**
FRANK A. MAGNANIMO
21031 Ventura Boulevard
Suite 803
Woodland Hills, CA 91364
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

6

**Attorneys for Plaintiff**

7
8
9
10
11

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
GREGORY M. EGLESTON
440 Park Avenue South, 5th Floor
New York, New York 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

12

*Attorneys for Plaintiff*

13
14
15

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

16
17
18
19
20
21
22
23
24
25
26
27
28

LEONARD R. PINTO, Derivatively on Behalf of ARLO TECHNOLOGIES, INC.,

          Plaintiff,

      v.

SEAN AGGARWAL, JOCELYN E. CARTER-MILLER, RALPH E. FAISON, MATTHEW McRAE, MIKE POPE, GRADY K. SUMMERS, and AMY ROTHSTEIN

          Defendants,

-and-

ARLO TECHNOLOGIES, INC.

          Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Leonard R. Pinto ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Arlo Technologies, Inc. ("Arlo" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Arlo with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is an action on behalf of persons and/or entities who purchased or otherwise acquired Arlo common stock and continue to hold said stock to the present.

2. Arlo issued a false and/or misleading Registration Statement and Prospectus (collectively, the "Registration Statement") in connection with Arlo's August 3, 2018 initial public offering (the "IPO" or the "Offering").

3. Since that time, Arlo and certain officers and/or directors of Arlo have been made defendants in a securities fraud suit by investors who alleged they were damaged by the false and misleading statements, and who seek to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

4. Arlo was incorporated in 2018 and is headquartered in San Jose, California. The Company provides smart connected devices that can purportedly monitor environments in real-time using its cloud-based platform. This is accomplished by using a Wi-Fi or cellular network Internet connection in the Americas, Europe, the Middle-East, Africa, and the Asia Pacific regions. By using Arlo's cloud-based platform, consumers may engage in real-time with their families

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

and businesses from any location with an internet connection. Arlo also offers Wi-Fi- and LTE-enabled cameras, advanced baby monitors, and smart security lights.

5. On August 6, 2018, Arlo filed its prospectus for its upcoming IPO with the SEC, which forms part of the Registration Statement. Arlo sold 11,747,250 shares of common stock at $16.00 per share in its IPO, for proceeds of approximately $167.4 million, net of underwriting discounts and commissions, purportedly to be used for general corporate purposes.

6. Arlo was a wholly-owned subsidiary of NETGEAR, Inc. ("NETGEAR") before the IPO. NETGEAR offers products enabling networking, broadband access, and network connectivity. NETGEAR owned approximately 84.2% of the shares of Arlo's outstanding common stock after the IPO.

7. On November 30, 2018, Arlo announced its "flagship wire-free security camera system" called Arlo Ultra ("Ultra"). The Company touted a "newly designed rechargeable battery" that would purportedly enable the Ultra product to provide 4K Ultra HD resolution with high dynamic range, color night vision, and advanced image processing.

8. The Company made materially false and misleading statements regarding its business, operational and compliance policies. Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (i) there was a flaw and/or quality issue with Arlo's newly designed battery for its Ultra camera systems; (ii) this flaw and/or quality issue with the Ultra battery could result in a shipping delay of Arlo's Ultra product; (iii) such a shipping delay endangered Arlo's chances of launching the Ultra product in time for the crucial holiday season; (iv) such a shipping delay would allow Arlo's competitors to capitalize on the Ultra product's missed launch, thereby increasing their own market share; (v) Arlo's consumers had been experiencing battery drain issues and other battery-related issues in connection with recent firmware updates; (vi) because of the foregoing, Arlo's fourth quarter 2018 results and consumer base would be negatively impacted;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1   and (vii) as a result, Arlo's Registration Statement was materially false and
2   misleading at all relevant times.

3        9.     On December 3, 2018, Arlo reported a delay in shipments of Ultra,
4   citing "a quality issue with the battery from one of its suppliers" that was discovered
5   during the product's final testing phase. As a result of the delay, Ultra also lowered
6   its fourth quarter 2018 financial guidance, advising investors that it anticipated "net
7   revenue to be in the range of $125 million to $130 million, non-GAAP gross margin
8   to be approximately 10%, and non-GAAP operating loss to be approximately 20%
9   of revenue."

10       10.    Following this news, Arlo's stock price fell $2.75 per share, or 22.86%,
11   to close at $9.28 on December 3, 2018. This constituted a decline of $6.72, or
12   approximately 42%, from the IPO price of $16.00 per share.

## JURSIDICTION AND VENUE

14       11.    Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities
15   Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the
16   claims asserted herein for violations of sections 10(b) of the Exchange Act. This
17   Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §
18   1367.

19       12.    This Court has jurisdiction over each defendant named herein because
20   each defendant is either a corporation that conducts business in and maintains
21   operations in this District or is an individual who has sufficient minimum contacts
22   with this District to render the exercise of jurisdiction by the District courts
23   permissible under traditional notions of fair play and substantial justice.

24       13.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391
25   because: (i) Arlo maintains its principal place of business in this District; (ii) one or
26   more of the defendants either resides in or maintains executive offices in this
27   District; (iii) a substantial portion of the transactions and wrongs complained of
28   herein, including Defendants' primary participation in the wrongful acts detailed

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Arlo, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

14.     ***Plaintiff Leonard R. Pinto*** ("Plaintiff") is a current owner of Arlo's stock and has held the stock during the time of the continuous wrongful course of conduct alleged herein.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

15.     ***Defendant Arlo Technologies, Inc.*** ("Arlo" or the "Company") is a Delaware corporation with its principal executive offices located at 3030 Orchard Parkway, San Jose, CA 95134.

**Director Defendants**

16.     ***Defendant Sean Aggarwal*** ("Aggarwal") has served as a member of Arlo's Board of Directors since October 2018.  Defendant Aggarwal is a member of the Compensation, Nominating and Corporate Governance, and Cybersecurity committees.

17.     ***Defendant Jocelyn E. Carter-Miller ("Carter")*** has served as a member of Arlo's Board of Directors since August 2018.  Defendant Carter is a member of the Audit and Strategic committees.  Defendant Carter is the Chair of the Compensation Committee.

18.     ***Defendant Ralph E. Faison ("Faison")*** has served as Chairman of the Board of Directors since August 2018.  Defendant Faison is a member of the Compensation and Cybersecurity committees.  Defendant Faison is the Chair of the Nominating and Corporate Governance Committee and Strategic Committee.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

19.     **Defendant Matthew McRae ("McRae")** was, at all relevant times, the Chief Executive Officer and one of the Directors of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.     **Defendant Mike Pope ("Pope")** has served as a member of Arlo's Board of Directors since October 2018.  Defendant Pope is the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

21.     **Defendant Grady Summers ("Summers")** has served as a member of Arlo's Board of Directors since August 2018.  Defendant Summers is a member of the Audit Committee and the Chair of the Cybersecurity Committee.

22.     **Defendant Amy Rothstein** ("Rothstein") has served as a director since May 7, 2019.  Defendant Rothstein is a member of the Strategic Committee.

23.     Defendants Aggrawal, Carter, Faison, McRae, Pope, Summers, and Rothstein are referred to herein as the "Director Defendants".

## ARLO'S CORPORATE GOVERNANCE

24.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

25.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

### CODE OF BUSINESS ETHICS AND CONFLICT OF INTEREST POLICY FOR DIRECTORS, OFFICERS AND KEY EMPLOYEES

26.     The Company maintains a Code of Business Conduct and Ethics ("Code of Conduct").  The Code of Conduct states in relevant part:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

IV. DISCLOSURE TO THE SEC AND THE PUBLIC

Our policy is to provide full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in our other public communications. Accordingly, Covered Persons must ensure that they and others in the Company comply with our disclosure controls and procedures and our internal controls for financial reporting. In the event any Covered Person believes or suspects that any information that is filed with, or submitted to the SEC, or otherwise made publicly available is materially inaccurate or misleading, or if such Covered Person has identified or has suspicion of a material weakness in the Company's public reporting procedures, such Covered Person shall promptly raise such concern with one of the following: the Chief Financial Officer, or the SVP of Human Resources, or General Counsel, or Internal Audit or Chairman of the Audit Committee (or other member of the Audit Committee, as may be appropriate). Such report may be made on an anonymous basis.

27.     As stated therein, the Code of Conduct applies to all of Arlo's officers, directors, and employees.   The wrongful conduct of the Director Defendants complained of herein violates the Code of Conduct.

**CHARTER FOR THE AUDIT COMMITTEE**
**OF THE BOARD OF DIRECTORS**

28.     Arlo maintains an Audit Committee Charter.   The Audit Committee Charter states in relevant part:

The Audit Committee's responsibility is one of oversight. The members of the Audit Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the independent auditors. The Audit Committee relies on the expertise and knowledge of management and the independent auditors in carrying out its oversight responsibilities. The management of the Company is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles and for establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The independent auditors are

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

responsible for auditing the Company's annual consolidated financial statements and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's periodic financial statements. It is not the responsibility of the Audit Committee to prepare or certify the Company's financial statements or guarantee the audits or reports of the independent auditors, nor is it the duty of the Audit Committee to certify that the independent auditor is "independent" under applicable rules. These are the fundamental responsibilities of management and the independent auditors.

\*   \*   \*

COMMITTEE RESPONSIBILITIES AND AUTHORITY:

The responsibilities of the Audit Committee shall include:

- Overseeing the Company's system of internal controls over financial reporting, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

- Prior to engagement of any prospective auditors, reviewing a written disclosure by the prospective auditors of all relationships between the prospective auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and to discuss with the prospective auditors the potential effects of such relationships on the independence of the prospective auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence, of the Public Company Accounting Oversight Board (United States) (the "PCAOB");

- Appointing, retaining, compensating and overseeing the work of the independent auditors (including resolving disagreements between management and the independent auditors regarding

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

financial reporting) for the purpose of preparing or issuing an audit report or related work. The Audit Committee shall submit its selection of the independent auditors to the Company's stockholders for their non-binding ratification on an annual basis;

- Pre-approving audit and permissible non-audit services provided to the Company by the independent auditors (or subsequently approving non-audit services in those circumstances where a subsequent approval is necessary and permissible); in this regard, the Audit Committee shall have the sole authority to approve the selection and termination of the independent auditors (which independent auditors shall report to the Audit Committee), all audit engagement fees and terms and all non-audit engagements, as may be permissible, with the independent auditors;

- Reviewing and discussing with the independent auditors any documentation supplied by the independent auditors as to the nature and scope of any tax services to be approved, as well as the potential effects of the provision of such services on the auditor's independence;

- Reviewing and providing oversight with respect to the external audit and the Company's relationship with its independent auditors by (i) reviewing the independent auditors' proposed audit scope, approach and independence for the annual audit and quarterly reviews for the current year; (ii) obtaining on a periodic basis a written statement from the independent auditors regarding relationships and services with the Company which may impact independence and presenting this statement to the Board, and to the extent there are relationships, monitoring and investigating them; (iii) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, changes in the Company's selection or application of accounting principles, any difficulties encountered in the course of the audit work, suggestions for improvements provided to management by the independent auditors, any restrictions on the scope of activities or access to requested information, any significant disagreements with management and any other required communications described in applicable accounting

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

standards, significant new accounting policies and any other matters described in PCAOB AS 1301 – Communications with Audit Committees, as may be modified or supplemented; and (iv) reviewing reports submitted to the audit committee by the independent auditors in accordance with the applicable SEC requirements;

- Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," in connection with filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

- Engaging the Company's independent auditors to review, prior to filing with the SEC, the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

- Reviewing, prior to announcement, the Company press releases containing material financial information and discussing with management whether such press releases properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, applicable rules and regulations of the SEC governing the disclosure of such non-GAAP information;

- Overseeing compliance with the requirements of the SEC and the New York Stock Exchange for disclosure of auditor's services and audit committee members, member qualifications and activities;

- At least annually, obtaining and reviewing a report by the independent auditor describing the audit firm's internal quality-control procedures and any material issues raised by the most recent internal quality-control procedures and any material issues raised by the most recent internal quality-control, peer review or

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

any inquiry or investigation by governmental or professional authorities within the preceding two years, and any steps to deal with any identified issues;

- Discussing with management and the independent auditors correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies;

- Reviewing management's monitoring of compliance with the Foreign Corrupt Practices Act, the UK Anti-Bribery Act and any other similar laws;

- Annually reviewing and providing to the Board for its approval the Company's Code of Business Ethics and Conflict of Interest Policy for Directors, Officers and Key Employees, in accordance with applicable law;

- Reviewing annually the results of the annual Certification of the Code of Business Ethics and Conflict of Interest Policy For Directors, Officers and Key Employees with management, and the disposition of all instances of noncompliance as appropriate;
- Setting clear hiring policies for employees or former employees of the Company's independent auditors, consistent with SEC and the New York Stock Exchange regulations and guidelines;

- Reviewing and evaluating the lead partner of the independent auditor team and ensuring an orderly rotation of the lead audit partner as required by law;

- Reviewing with the independent auditors, as appropriate, communications between the audit team and the independent auditors' national office with respect to accounting or auditing issues presented by the engagement;

- Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- Reviewing and discussing with management and the independent auditor the Company's financial risk exposures (including its investment policies) and assessing the policies and processes management has implemented to monitor and control such exposures;

- Assisting the Board in fulfilling its oversight responsibilities regarding the Company's policies and processes with respect to enterprise risk assessment and management, including any significant non-financial risk exposures;

- If necessary, instituting special investigations with full access to all books, records, facilities and personnel of the Company;

- Obtaining advice and assistance from outside legal, accounting or other advisors, with any resulting expenses being paid by the Company;

- Reviewing in advance and approving all transactions between the Company and a related party for which review or approval is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings;

- At least annually, reviewing its own charter, structure, processes, and membership requirements and performing an annual self-evaluation of its performance;

- Providing a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting, internal accounting controls, auditing matters or related matters;

- Reviewing and advising the Chief Executive Officer and the Board with respect to the appointment, dismissal and replacement of the chief financial officer (and chief accounting

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

officer) and consulting with the Chief Executive Officer about the performance goals and subsequent performance evaluation and compensation of each;

- Reviewing the performance, and determining the scope, roles and responsibilities, of the Company's internal audit function, including: (i) assessing resource requirements (internal, external and/or combined); (ii) reviewing with management and the chief internal audit executive any Internal Audit Charter, audit plans, activities, staffing and organizational structure of the internal audit function; (iii) ensuring there are no unjustified restrictions or limitations on the chief internal audit executive; (iv) reviewing any significant reports to management prepared by the internal audit department, including management's adoption and resolution of the internal audit department's recommendations; (v) reviewing the effectiveness of the internal audit function annually as part of the year-end external audit and reporting process; and (vi) on a regular basis, meeting separately with the chief internal audit executive to discuss any matters that the Audit Committee or internal audit believes should be discussed privately;

- Reviewing and discussing with executive management, and recommending to the Board, the appointment or dismissal of the chief internal audit executive and consulting with executive management about his or her performance goals and subsequent performance evaluation and compensation, and the application of the Company's compensation policies to other internal audit personnel; and

- Any additional responsibility or authority mandated by the SEC, the New York Stock Exchange or other applicable rule or regulation.

29.     The purpose of the Audit Committee is to assist Arlo's Board of Directors in its oversight of accounting, financial reporting and disclosure processes and adequacy of systems of disclosure and internal controls. The wrongful conduct

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

of the Director Defendants complained of herein violates the Charter of the Audit Committee.

30.     The Board of Directors of Arlo are also charged with developing and maintaining the Company's corporate governance policies and any related matters required by the federal securities laws.   The wrongful conduct of the Director Defendants complained of herein violates good corporate governance principles.

## DUTIES OF THE DIRECTOR DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.   The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.   The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

32.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.   In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

33.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other things:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

34.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

35.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business opportunities, results, and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

36.     In committing the wrongful acts alleged herein, the Director Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Director Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Director Defendants, collectively and individually, initiated or allowed a course of conduct that was designed to and did deceive the investing public, including stockholders of Arlo, regarding its alleged agreement with a customer, and its business and business prospects discussed herein.  In furtherance of this plan, conspiracy, and course of conduct, the Director Defendants, collectively and individually, took the actions set forth herein.

38.     The Director Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Director Defendants

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

caused the Company to issue false and misleading press releases and other public filings as alleged herein.

39.    The purpose and effect of the Director Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Director Defendants' violations of law and breaches of fiduciary duty, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

40.    The Director Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.    Because the actions described herein occurred under the authority of the Board, each of the Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.    Each of the Director Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Director Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**Background**

42.    Arlo was incorporated in 2018 and is headquartered in San Jose, California.  The Company provides smart connected devices that can purportedly monitor environments in real-time using its cloudbased platform. This is accomplished by using a Wi-Fi or cellular network Internet connection in the Americas, Europe, the Middle-East, Africa, and the Asia Pacific regions. By using Arlo's cloud-based platform, consumers may engage in real-time with their families

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

and businesses from any location with an internet connection.  Arlo also offers Wi-Fi- and LTE-enabled cameras, advanced baby monitors, and smart security lights.

43.    Arlo was a wholly-owned subsidiary of NETGEAR before the IPO. NETGEAR offers products enabling networking, broadband access, and network connectivity.  NETGEAR owned approximately 84.2% of the shares of Arlo's outstanding common stock after the IPO.

44.    On November 30, 2018, Arlo announced Ultra—the Company's "flagship wire-free security camera system."  The Company touted a "newly designed rechargeable battery" that would purportedly enable the Ultra product to provide 4K Ultra HD resolution with high dynamic range, color night vision, and advanced image processing.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

45.    On July 31, 2018, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The Registration Statement was declared effective on August 2, 2018.

46.    On August 6, 2018, the Company filed its prospectus for its upcoming IPO with the SEC, which forms part of the Registration Statement.  The Company sold 11,747,250 shares of common stock at $16.00 per share in its IPO, for proceeds of approximately $167.4 million, net of underwriting discounts and commissions, purportedly to be used for general corporate purposes.

47.    The Registration Statement and Prospectus for the IPO (collectively, the "Registration Statement") were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.  Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends,

events, or uncertainties that were having, and were reasonably likely to have, an impact on Arlo's continuing operations.

48.  The Registration Statement contained merely boilerplate information concerning the risk of delays in launching new products, stating, in relevant part:

> ***If we fail to continue to introduce or acquire new products or services that achieve broad market acceptance on a timely basis, or if our products or services are not adopted as expected, we will  not be able to compete effectively and we will be unable to increase or maintain revenue and gross margin.***
>
> \* \* \*
>
> ***We may experience delays and quality issues in releasing new products and services, which may result in lower quarterly revenue than expected.***

(Second emphasis added.)

49.  The Registration Statement also contained information concerning the risk of defective components supplied by third-party manufacturers, stating, in relevant part:

> We obtain several key components from limited or sole sources, and if these sources fail to satisfy our supply requirements or we are unable to properly manage our supply requirements with our third-party manufacturers, we may lose sales and experience increased component costs.
>
> Any shortage or delay in the supply of key product components would harm our ability to meet scheduled product deliveries.  Many of the components used in our products are specifically designed for use in our products, some of which are obtained from sole source suppliers. These components include lens, lens-sensors and passive infrared ("PIR") sensors that have been customized for the Arlo application, as well as custom-made batteries that provide power conservation and safety features.  In addition, the components used in our end products have been optimized to extend battery life.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

* * *

If we are unable to obtain a sufficient supply of components, or if we experience any interruption in the supply of components, our product shipments could be reduced or delayed or our cost of obtaining these components may increase.  Component shortages and delays affect our ability to meet scheduled product deliveries, damage our brand and reputation in the market, and cause us to lose sales and market share […].   In addition, at times sole suppliers of highly specialized components have provided components that were either defective or did not meet the criteria required by our retailers, distributors or other channel partners, resulting in delays, lost revenue opportunities and potentially substantial write-offs.

50.     Additionally, the Registration Statement touted the Company's "power management expertise" as one of "three key technology differentiators," stating, in relevant part:

We have built Arlo platform on three key technology differentiators:

* * *

Our proven power management expertise, leveraged from NETGEAR's years of experience building mobile hotspots, encompasses hardware product design, software and firmware, including patented beaconing and power management methods, to prolong battery life.

* * *

Arlo's power management expertise, encompassing hardware product design, software and firmware, minimizes power consumption in our devices. Motion-activated on/off sensors prolong the devices' overall battery life, and our patented low-power Wi-Fi technology also minimizes battery usage before and during video transmission. As a result, our users typically only need to recharge their Arlo devices every three to six months, leading to flexible indoor and outdoor placement options.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

51.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results. Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (i) there was a flaw and/or quality issue with Arlo's newly designed battery for its Ultra camera systems; (ii) this flaw and/or quality issue with the Ultra battery could result in a shipping delay of Arlo's Ultra product; (iii) such a shipping delay endangered Arlo's chances of launching the Ultra product in time for the crucial holiday season; (iv) such a shipping delay would allow Arlo's competitors to capitalize on the Ultra product's missed launch, thereby increasing their own market share; (v) Arlo's consumers had been experiencing battery drain issues and other battery-related issues in connection with recent firmware updates; (vi) because of the foregoing, Arlo's fourth quarter 2018 results and consumer base would be negatively impacted; and (vii) as a result, Arlo's Registration Statement was materially false and misleading at all relevant times.

52.     On August 27, 2018, the Company filed a Form 10-Q for the quarterly period ended July 1, 2018 ("07/01/18 Form 10-Q").  In that 07/01/18 Form 10-Q, the Company stated:

> We obtain several key components from limited or sole sources, and if these sources fail to satisfy our supply requirements or we are unable to properly manage our supply requirements with our third-party manufacturers, we may lose sales and experience increased component costs.
>
> Any shortage or delay in the supply of key product components would harm our ability to meet scheduled product deliveries. Many of the components used in our products are specifically designed for use in our products, some of which are obtained from sole source suppliers. These components include lens, lens-sensors, and passive infrared ("PIR") sensors that have been customized for the Arlo application, as well as custom-made batteries that provide power conservation and

safety features. In addition, the components used in our end products have been optimized to extend battery life. Our third-party manufacturers generally purchase these components on our behalf, and we do not have any contractual commitments or guaranteed supply arrangements with our suppliers. If demand for a specific component increases, we may not be able to obtain an adequate number of that component in a timely manner. In addition, if worldwide demand for the components increases significantly, the availability of these components could be limited. Further, our suppliers may experience financial or other difficulties as a result of uncertain and weak worldwide economic conditions. Other factors that may affect our suppliers' ability or willingness to supply components to us include internal management or reorganizational issues, such as roll-out of new equipment which may delay or disrupt supply of previously forecasted components, or industry consolidation and divestitures, which may result in changed business and product priorities among certain suppliers. It could be difficult, costly, and time consuming to obtain alternative sources for these components, or to change product designs to make use of alternative components. In addition, difficulties in transitioning from an existing supplier to a new supplier could create delays in component availability that would have a significant impact on our ability to fulfill orders for our products.

55.     On November 2, 2018, the Company filed a Form 10-Q for the quarterly period ended September 30, 2018 ("09/30/18 Form 10-Q").   In that 09/30/18 Form 10-Q, the Company stated:

We obtain several key components from limited or sole sources, and if these sources fail to satisfy our supply requirements or we are unable to properly manage our supply requirements with our third-party manufacturers, we may lose sales and experience increased component costs.

Any shortage or delay in the supply of key product components would harm our ability to meet scheduled product deliveries. Many of the components used in our products are specifically designed for use in our products, some of which are obtained from sole source suppliers. These components include lens, lens-sensors, and passive infrared ("PIR") sensors that have been customized for the Arlo application, as well as custom-made batteries that provide power conservation and

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 21 -

safety features. In addition, the components used in our end products have been optimized to extend battery life. Our third-party manufacturers generally purchase these components on our behalf, and we do not have any contractual commitments or guaranteed supply arrangements with our suppliers. If demand for a specific component increases, we may not be able to obtain an adequate number of that component in a timely manner. In addition, if worldwide demand for the components increases significantly, the availability of these components could be limited. Further, our suppliers may experience financial or other difficulties as a result of uncertain and weak worldwide economic conditions. Other factors that may affect our suppliers' ability or willingness to supply components to us include internal management or reorganizational issues, such as roll-out of new equipment which may delay or disrupt supply of previously forecasted components, or industry consolidation and divestitures, which may result in changed business and product priorities among certain suppliers. It could be difficult, costly, and time consuming to obtain alternative sources for these components, or to change product designs to make use of alternative components. In addition, difficulties in transitioning from an existing supplier to a new supplier could create delays in component availability that would have a significant impact on our ability to fulfill orders for our products.

56.     The statements referenced above in paragraphs 54-55 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results. Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (i) there was a flaw and/or quality issue with Arlo's newly designed battery for its Ultra camera systems; (ii) this flaw and/or quality issue with the Ultra battery could result in a shipping delay of Arlo's Ultra product; (iii) such a shipping delay endangered Arlo's chances of launching the Ultra product in time for the crucial holiday season; (iv) such a shipping delay would allow Arlo's competitors to capitalize on the Ultra product's missed launch, thereby increasing their own market share; (v) Arlo's consumers had been experiencing battery drain issues and other battery-related issues in connection with

recent firmware updates; (vi) because of the foregoing, Arlo's fourth quarter 2018 results and consumer base would be negatively impacted; and (vii) as a result, Arlo's Registration Statement was materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

57.     On December 3, 2018, the Company reported a delay in shipments of Ultra, citing "a quality issue with the battery from one of its suppliers" that was discovered during the product's final testing phase.  As a result of the delay, Ultra also lowered its fourth quarter 2018 financial guidance, advising investors that it anticipated "net revenue to be in the range of $125 million to $130 million, non-GAAP gross margin to be approximately 10%, and non-GAAP operating loss to be approximately 20% of revenue."

58.     Following this news, the Company's stock price fell $2.75 per share, or 22.86%, to close at $9.28 on December 3, 2018.  This constituted a decline of $6.72, or approximately 42%, from the IPO price of $16.00 per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

60.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

61.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.

62.     Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

63.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants and/or the former directors.

64.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

63.    The Company Board is currently comprised of seven (7) members – Aggrawal, Carter, Faison, McRae, Pope, Summers, and Rothstein.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

64.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

65.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

66.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

67.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 24 -

68.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

69.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant McRae**

70.     Defendant McRae is not disinterested or independent, and therefore, is incapable of considering demand because McRae (as CEO of the Company) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, McRae cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

71.     This lack of independence and financial benefits received by McRae renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

72.     In addition, McRae is a defendant in the securities class action entitled *Wong v. Arlo Technologies, Inc., et. al.*, Case 5:19-cv-00372-BLF (N.D. Cal.) ("Federal Securities Class Action").

73.     Defendant McRae is also a defendant in the state class actions pursuant to Section 11 of the Securities Act of 1933 entitled: (i) *Vardanian, et al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV342318 (Supr. Ct. Cal., Santa Clara County) (the "Vardanian Section 11 Class Action"); (ii) *Pham v. Arlo Technologies, Inc., et al.*, Case No.: 19CV340741 (Supr. Ct. Cal., Santa Clara County) (the "Pham

Section 11 Class Action"); (iii) *Patel v. Arlo Technologies, Inc., et al.*, Case No. 19CV340758 (Supr. Ct. Cal., Santa Clara County) (the "Patel Section 11 Class Action"); (iv) *Hill, et. al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV343033 (Supr. Ct. Cal., Santa Clara County) (the "Hill Section 11 Class Action"); and (v) *Aversa v. Arlo Technologies, Inc., et al.*, Case No.: 18CV339231 (Supr. Ct. Cal., Santa Clara County) (the "Aversa Section 11 Class Action") (collectively, the State Section 11 Class Actions").

74.     As such, Defendant McRae cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Carter**

75.     Defendant Carter is also a defendant in the state class actions pursuant to Section 11 of the Securities Act of 1933 entitled: (i) *Vardanian, et al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV342318 (Supr. Ct. Cal., Santa Clara County) (the "Vardanian Section 11 Class Action"); (ii) *Pham v. Arlo Technologies, Inc., et al.*, Case No.: 19CV340741 (Supr. Ct. Cal., Santa Clara County) (the "Pham Section 11 Class Action"); (iii) *Patel v. Arlo Technologies, Inc., et al.*, Case No. 19CV340758 (Supr. Ct. Cal., Santa Clara County) (the "Patel Section 11 Class Action"); and (iv) *Hill, et. al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV343033 (Supr. Ct. Cal., Santa Clara County) (the "Hill Section 11 Class Action").

76.     As such, Defendant Carter cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Faison**

77.     Defendant Faison is also a defendant in the state class actions pursuant to Section 11 of the Securities Act of 1933 entitled: (i) *Vardanian, et al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV342318 (Supr. Ct. Cal., Santa Clara

County) (the "Vardanian Section 11 Class Action"); (ii) *Pham v. Arlo Technologies, Inc., et al.*, Case No.: 19CV340741 (Supr. Ct. Cal., Santa Clara County) (the "Pham Section 11 Class Action"); (iii) *Patel v. Arlo Technologies, Inc., et al.*, Case No. 19CV340758 (Supr. Ct. Cal., Santa Clara County) (the "Patel Section 11 Class Action"); and (iv) *Hill, et. al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV343033 (Supr. Ct. Cal., Santa Clara County) (the "Hill Section 11 Class Action").

78.     As such, Defendant Faison cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Summers**

79.     Defendant Summers is also a defendant in the state class actions pursuant to Section 11 of the Securities Act of 1933 entitled: (i) *Vardanian, et al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV342318 (Supr. Ct. Cal., Santa Clara County) (the "Vardanian Section 11 Class Action"); (ii) *Pham v. Arlo Technologies, Inc., et al.*, Case No.: 19CV340741 (Supr. Ct. Cal., Santa Clara County) (the "Pham Section 11 Class Action"); (iii) *Patel v. Arlo Technologies, Inc., et al.*, Case No. 19CV340758 (Supr. Ct. Cal., Santa Clara County) (the "Patel Section 11 Class Action"); and (iv) *Hill, et. al. v. Arlo Technologies, Inc., et al.*, Case No.: 19CV343033 (Supr. Ct. Cal., Santa Clara County) (the "Hill Section 11 Class Action").

80.     As such, Defendant Summers cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendants Pope, Summers and Miller**

81.     Defendants Pope, Summers and Miller served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the purposes of

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

the Committee are to assist the Board in fulfilling its oversight responsibilities related to:

- The accounting and financial reporting processes of the Company and audits of the financial statements of the Company;
- The integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications, independence, performance, and compensation; and the Company's internal controls over financial reporting and disclosure controls and procedures;
- The preparation and approval of the reports that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement;
- The Company's internal audit function;
- Transactions between the Company and a related party; and
- The application of the Company's Code of Business Ethics and Conflict of Interest Policy for Directors, Officers and Key Employees as established by the Board.

82.     Defendants Pope, Summers and Miller breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies discussed herein.  Thus, Defendants Pope, Summers and Miller face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

### Against the Director Defendants for Breach of Fiduciary Duty

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1    84.   The Director Defendants owe the Company fiduciary obligations.  By

2  reason of their fiduciary relationships, the Director Defendants owed and owe the

3  Company the highest obligation of good faith, fair dealing, loyalty, and due care.

4    85.   The Director Defendants violated and breached their fiduciary duties of

5  care, loyalty, reasonable inquiry, and good faith.

6    86.   The Director Defendants engaged in a sustained and systematic failure

7  to properly exercise their fiduciary duties.   Among other things, the Director

8  Defendants breached their fiduciary duties of loyalty and good faith by allowing the

9  Company to improperly misrepresent the existence of a strategic alliance agreement

10 and the Company's publicly reported business performance, and failed to maintain

11 an adequate system of oversight, disclosure controls and procedures, and internal

12 controls as alleged herein.  These actions could not have been a good faith exercise

13 of prudent business judgment to protect and promote the Company's corporate

14 interests.

15   87.   As a direct and proximate result of the Director Defendants' failure to

16 perform their fiduciary obligations, the Company has sustained significant damages.

17 As a result of the misconduct alleged herein, the Director Defendants are liable to

18 the Company.

19   88.   As a direct and proximate result of the Director Defendants' breach of

20 their fiduciary duties, the Company has suffered damage, not only monetarily, but

21 also to its corporate image and goodwill.   Such damage includes, among other

22 things, costs associated with defending securities lawsuits, severe damage to the

23 share price of the Company, resulting in an increased cost of capital, and

24 reputational harm.

## COUNT II

### Against the Director Defendants for Waste of Corporate Assets

27   89.   Plaintiff incorporates by reference and realleges each and every

28 allegation contained above, as though fully set forth herein.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 29 -

90.    The wrongful conduct alleged regarding the issuance of false and misleading statements and its failure to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

91.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

92.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

93.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### Against Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

94.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.    During the Relevant Period, Defendants disseminated or approved public statements that misrepresented or failed to disclose the true facts. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) there was a flaw and/or quality issue with Arlo's newly designed battery for its Ultra camera systems; (ii) this flaw and/or quality issue with the Ultra battery could result in a shipping delay of Arlo's Ultra product; (iii) such a shipping delay endangered Arlo's chances of launching the Ultra product in time for the crucial holiday season; (iv) such a shipping delay would allow Arlo's competitors to capitalize on the Ultra product's missed launch, thereby increasing their own market share; (v) Arlo's consumers had been experiencing battery drain issues and other

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

battery-related issues in connection with recent firmware updates; (vi) because of the foregoing, Arlo's fourth quarter 2018 results and consumer base would be negatively impacted; and (vii) as a result, Arlo's Registration Statement was materially false and misleading at all relevant times.

96.    As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

> (a)    employed devices, schemes, and artifices to defraud; and
>
> (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)    Awarding such other and further relief as is just and equitable.

## **JURY TRIAL DEMANDED**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1          Plaintiff hereby demands a trial by jury.

2     Dated: June 10, 2019

3
                                        **MAGNANIMO & DEAN, LLP**
4

5                                       By: */s/ Frank A. Magnanimo*
                                           Frank A. Magnanimo
6                                       21031 Ventura Boulevard
                                        Suite 803
7                                       Woodland Hills, CA 91364
                                        Telephone: (818) 305-3450
8                                       Facsimile: (818) 305-3451
                                        Email: Frank@MagDeanLaw.com
9
                                        **GAINEY McKENNA & EGLESTON**
10                                      Thomas J. McKenna
                                        Gregory M. Egleston
11                                      440 Park Avenue South, 5th Floor
                                        New York, NY 10016
12                                      Telephone: (212) 983-1300
                                        Facsimile: (212) 983-0383
13                                      Email: tjmckenna@gme-law.com
                                        Email: gegleston@gme-law.com
14
                                        ***Attorneys for Plaintiff***
15

16
      Of Counsel:
17    **MOORE KUEHN, PLLC**
      Fletcher Moore, Esq.
18    30 Wall Street, 8th Floor
      New York, NY 10005
19

20

21

22

23

24

25

26

27

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 32 -