1
2
3
4
5

**MAGNANIMO & DEAN, LLP**
FRANK A. MAGNANIMO
21031 Ventura Boulevard
Suite 803
Woodland Hills, CA 91364
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

6
7
8
9
10

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
GREGORY M. EGLESTON
501 Fifth Avenue, 19th Floor
New York, New York 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

11

*Attorneys for Plaintiff*

12
13
14

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEONARD R. PINTO, Derivatively on Behalf of ARLO TECHNOLOGIES, INC.,

        Plaintiff,

        v.

SEAN AGGARWAL, JOCELYN E. CARTER-MILLER, RALPH E. FAISON, MATTHEW McRAE, MIKE POPE, GRADY K. SUMMERS, and AMY ROTHSTEIN

        Defendants,

-and-

ARLO TECHNOLOGIES, INC.

        Nominal Defendant.

    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )

Case No.: 5:19-cv-03354-BLF


**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Leonard R. Pinto ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Arlo Technologies, Inc. ("Arlo" or the "Company"), submits this Amended Verified Shareholder Derivative Complaint (the "Amended Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Arlo with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of the Company, against certain of its officers and/or directors named as defendants herein seeking to remedy Defendants (defined below) violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from August 3, 2018 through the present (the "Relevant Period"). Defendants' (defined below) actions have caused, and will continue to cause, substantial financial harm and other damages to the Company, including damages to its reputation and goodwill.

2.      The Company is a provider of home security and monitoring systems. The Company's products include Wi-Fi- and LTE-enabled cameras, advanced baby monitors, and smart security lights. The Company claims to be the leader in the U.S. consumer network-connected camera-systems market, with a 48% market share as of the second quarter of 2018. The Company has enjoyed a "first-mover" advantage, as one of the first companies to mass produce easy-to-install home security cameras and the integrated smart technologies used to service the devices. As a result of its market dominance, purportedly superior product offerings, and

focus on product innovation, the Company has been able to charge a premium for its devices, with some of its security cameras selling for nearly double the price of its competitors' cameras.   The Registration Statement and Prospectus issued in connection with the Company's August 6, 2018 initial public offering (the "IPO") stated that Arlo would continue to offer industry "leading technology" in its products, maintain its competitive edge, and "continue to charge a premium price over competing products because of our superior product features, ease of use and bundled prepaid services."

3.     On August 6, 2018, the Company filed its Prospectus for the IPO with the SEC (the "Prospectus"), which was incorporated into and forms part of the Registration Statement for the IPO (together, with all amendments, the "Registration Statement").   By means of the Registration Statement, the Company sold over 11.7 million shares of common stock at a price of $16 per share, generating over $187 million in gross proceeds.   Prior to the IPO, the Company was a subsidiary of NETGEAR, Inc. ("NETGEAR").    NETGEAR spun off Arlo in the IPO and continued to control the Company after the IPO, owning over 80% of the shares of Arlo's outstanding common stock (the "Spin Off").

4.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.   Specifically, the Registration Statement failed to disclose that: (i) Arlo was suffering from adverse sales trends in its key product offerings; (ii) Arlo's products had begun the end of their sales cycle and the Company had failed to develop the new products necessary to replace them; (iii) Arlo needed to engage in aggressive promotional activity and cut prices in order to maintain sales growth and stave off competition from well-resourced rivals, such as Google and Amazon, with significantly cheaper product offerings; (iv) Arlo's new flagship wire-free security

camera system, Arlo Ultra, suffered from quality control issues that jeopardized the Company's ability to launch the product in time for the crucial holiday season; and (v), as a result of (i)-(iv), the Company was experiencing extreme margin pressures, had lost its ability to maintain its historical price premium, and was suffering from accelerating negative sales and operational trends.

5.     On October 25, 2018, the Company issued a press release announcing its financial results for the quarter ended September 30, 2018 – ***the same quarter*** during which the Company had conducted the IPO.  Arlo announced that its GAAP gross margin had shrunk to 22.7% during the quarter, down from 25.5% the prior quarter and 27% in the comparable quarter the prior year. The press release also provided a dismal outlook for the Company's fourth quarter of 2018, with a projected GAAP gross margin of only 12.4% to 14.4% – or approximately ***half*** the Company's gross margin achieved in the quarter just prior to the IPO.  At the same time, the Company forecast revenues of only $140 million to $155 million for the quarter, which was a slight increase over the $131.2 million in quarterly revenues achieved in the third quarter of 2018, despite the fact that the Company historically recorded substantially higher revenues during the fourth quarter due to the holiday shopping season. For example, the Company generated more than a third of its annual revenues in the fourth quarter of 2017.

6.     During the earnings call to discuss the results, Christine M. Gorjanc ("Gorjanc"), the Company's Chief Financial Officer ("CFO"), stated that the sharp decline in gross margins was due to the high level of promotional activity the Company needed to engage in to promote sales and register users.  Gorjanc stated that the promotional activity was necessary because Arlo had failed to bring a new product to market and the Company's available products were later in their sales cycle, and thus less desirable to consumers. As a result, Arlo's technological advantage had been eroded by the time of the IPO and, unbeknownst to the market and contrary to representations made in the Registration Statement, the Company

would be unable to charge its historical price premium in the face of rising competition.

7.     Then, on December 3, 2018, the Company reported a delay in shipments of its Arlo Ultra flagship device due to "a quality issue with the battery from one of its suppliers." The defective cameras had been under development for months, including at the time of the IPO. As a result of the delay, the Company lowered its already disappointing fourth quarter 2018 financial guidance, with "net revenue to be in the range of $125 million to $130 million, non-GAAP gross margin to be approximately 10%, and non-GAAP operating loss to be approximately 20% of revenue." Thus, the Company would experience sequential revenue **contraction** and accelerating gross margin erosion despite the impact of the holiday shopping season and the aforementioned promotional activities.

8.     On December 4, 2018, the Company stock closed at $8.80 per share, or **45% less** than the price at which Arlo stock had sold in the IPO only four months previously.

9.     On May 21, 2021, the Company stock closed at $6.40 per share.

## JURSIDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

11.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

12.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Arlo maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Arlo, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

13.     ***Plaintiff Leonard R. Pinto*** ("Plaintiff") is a current owner of Arlo's stock, purchasing his stock in connection with the Registration Statement, and has held the stock during the time of the continuous wrongful course of conduct alleged herein, and continues to hold his Arlo stock.  Plaintiff will fairly and adequately represent the interests of the stockholders in enforcing the rights of the Company.

**Nominal Defendant**

14.     ***Defendant Arlo Technologies, Inc.*** ("Arlo" or the "Company") is a Delaware corporation with its principal executive offices located at 3030 Orchard Parkway, San Jose, CA 95134.  Arlo is incorporated in Delaware.

**Director Defendants**

15.     ***Defendant Sean Aggarwal*** ("Aggarwal") has served as a member of Arlo's Board of Directors (the "Board") since October 2018.  Defendant Aggarwal is a member of the Compensation, Nominating and Corporate Governance, and Cybersecurity committees.  Defendant Aggarwal was added as a member of the Audit Committee in April 2020.

16.     ***Defendant Jocelyn E. Carter-Miller*** ("Carter-Miller") was a director of the Company at the time of the IPO.  Defendant Carter-Miller had served on the

board of directors of NETGEAR since January 2009.  Defendant Carter-Miller was motivated by the financial implications of the Spin Off and IPO, given her financial stake in Arlo and NETGEAR.  As of the Spin Off and IPO, Defendant Carter-Miller beneficially owned over 11,000 NETGEAR shares, and in connection with the IPO, received Restricted Stock Units representing 12,500 shares of Arlo common stock. Defendant Carter-Miller is a member of the Audit and Strategic committees. Defendant Carter-Miller is the Chair of the Compensation Committee.

17.   ***Defendant Ralph E. Faison*** ("Faison") was, at all relevant times, the Chairman of the Board of the Company at the time of the IPO.  Defendant Faison had served on the board of directors of NETGEAR since August 2003.  Defendant Faison was motivated by the financial implications of the Spin Off and IPO, given his financial stake in Arlo and NETGEAR.  As of the Spin Off and IPO, Defendant Faison beneficially owned over 33,000 NETGEAR shares, and in connection with the IPO, received Restricted Stock Units representing 12,500 shares of Arlo common stock. Defendant Faison is a member of the Compensation and Cybersecurity committees.  Defendant Faison is the Chair of the Nominating and Corporate Governance Committee and Strategic Committee.

18.   ***Defendant Matthew McRae*** ("McRae") was, at all relevant times, the Chief Executive Officer ("CEO") and a director of the Company, as well as NETGEAR's Senior Vice President of Strategy as of the IPO.  Defendant McRae signed or authorized the signing of the false and misleading Registration Statement. As one of the executives in the Spin Off and IPO working group, Defendant McRae reviewed and approved, and participated in making statements in the Registration Statement. Defendant McRae also reviewed, edited and approved the road show PowerPoint presentation. Defendant McRae was motivated by the financial implications of the Spin Off and IPO, given his financial stake and incoming executive position in Arlo, as well as his financial interest in NETGEAR, Arlo's controlling shareholder. As of the Spin Off and IPO, Defendant McRae had

substantial holdings in NETGEAR and in connection with the IPO, received stock options representing 1,875,000 shares of Arlo common stock.

19.    **Defendant Mike Pope** ("Pope") has served as a member of Arlo's Board since October 2018.  Defendant Pope is the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

20.    **Defendant Grady Summers** ("Summers") was a director of the Company at the time of the IPO.  Defendant Summers had served on the board of directors of NETGEAR since January 2016.  Defendant Summers was motivated by the financial implications of the Spin Off and IPO, given his financial stake in Arlo and NETGEAR.  As of the Spin Off and IPO, Defendant Summers beneficially owned over 14,000 NETGEAR shares, and in connection with the IPO, received Restricted Stock Units representing 12,500 shares of Arlo common stock. Defendant Summers is a member of the Audit Committee and the Chair of the Cybersecurity Committee.

21.    **Defendant Amy Rothstein** ("Rothstein") has served as a director since May 7, 2019.  Defendant Rothstein is a member of the Strategic Committee.

22.    Defendants Aggrawal, Carter-Miller, Faison, McRae, Pope, Summers, and Rothstein are referred to herein as the "Director Defendants" or "Defendants".

**Non-Party**

23.    **Non-Party NETGEAR** is a consumer electronics company based in San Jose, California.  As the parent Company of Arlo, NETGEAR owned 100% of Arlo's outstanding common stock as of the IPO and held 84.2% of the Company's outstanding common stock after the IPO, having sold securities representing approximately 16% of its ownership interest in connection with the IPO. The Registration Statement identified NETGEAR as Arlo's "Controlling Shareholder" and listed numerous powers that NETGEAR had over Arlo, including "the power to determine matters submitted to a vote of our stockholders without the consent of [Arlo's] other stockholders." NETGEAR designated numerous personnel in the

working group for the Spin Off and IPO, including Defendant McRae, its Senior Vice President of Strategy, who became Arlo's Chief Executive Officer ("CEO") in connection with the Spin Off and IPO, and Christine M. Gorjane, its Chief Financial Officer, who became Arlo's Chief Financial Officer in connection with the Spin Off and IPO ("CFO"), as well as other executives, all of whom not only reviewed and approved the Registration Statement, but also participated in making presentations according to a PowerPoint reviewed and approved by them and other personnel on behalf of NETGEAR and Arlo. NETGEAR was motivated by the financial implications of the Spin Off and IPO, including (among other things) selling its interest in Arlo, transferring certain Arlo assets and liabilities, and being able to cause the issuance of marketable securities to further fund cash and securities into its capital structure.

## ARLO'S CORPORATE GOVERNANCE

24.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

25.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## CODE OF BUSINESS ETHICS AND CONFLICT OF INTEREST POLICY FOR DIRECTORS, OFFICERS AND KEY EMPLOYEES

26.     The Company maintains a Code of Business Conduct and Ethics ("Code of Conduct").  The Code of Conduct states in relevant part:

IV. DISCLOSURE TO THE SEC AND THE PUBLIC

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> ***Our policy is to provide full, fair, accurate, timely, and
> understandable disclosure in reports and documents that we file with,
> or submit to, the SEC and in our other public communications.***
> Accordingly, Covered Persons must ensure that they and others in the
> Company comply with our disclosure controls and procedures and our
> internal controls for financial reporting. In the event any Covered
> Person believes or suspects that any information that is filed with, or
> submitted to the SEC, or otherwise made publicly available is
> materially inaccurate or misleading, or if such Covered Person has
> identified or has suspicion of a material weakness in the Company's
> public reporting procedures, such Covered Person shall promptly raise
> such concern with one of the following: the Chief Financial Officer, or
> the SVP of Human Resources, or General Counsel, or Internal Audit or
> Chairman of the Audit Committee (or other member of the Audit
> Committee, as may be appropriate). Such report may be made on an
> anonymous basis. [Emphasis added].

27.    As stated therein, the Code of Conduct applies to all of Arlo's officers,
directors, and employees.   The wrongful conduct of the Director Defendants
complained of herein violates the Code of Conduct.

## THE AUDIT COMMITTEE CHARTER

28.    Arlo maintains an Audit Committee Charter.   The Audit Committee
Charter states in relevant part:

> The Audit Committee's responsibility is one of oversight. The
> members of the Audit Committee are not employees of the Company,
> and they do not perform, or represent that they perform, the functions
> of management or the independent auditors. The Audit Committee
> relies on the expertise and knowledge of management and the
> independent auditors in carrying out its oversight responsibilities. The
> management of the Company is responsible for preparing accurate and
> complete financial statements in accordance with generally accepted
> accounting principles and for establishing and maintaining appropriate
> accounting principles and financial reporting policies and satisfactory
> internal control over financial reporting. The independent auditors are
> responsible for auditing the Company's annual consolidated financial
> statements and the effectiveness of the Company's internal control over
> financial reporting and reviewing the Company's periodic financial

statements. It is not the responsibility of the Audit Committee to prepare or certify the Company's financial statements or guarantee the audits or reports of the independent auditors, nor is it the duty of the Audit Committee to certify that the independent auditor is "independent" under applicable rules. These are the fundamental responsibilities of management and the independent auditors.

\*   \*   \*

COMMITTEE RESPONSIBILITIES AND AUTHORITY:

The responsibilities of the Audit Committee shall include:

- ***Overseeing the Company's system of internal controls over financial reporting, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure***;

- Prior to engagement of any prospective auditors, reviewing a written disclosure by the prospective auditors of all relationships between the prospective auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and to discuss with the prospective auditors the potential effects of such relationships on the independence of the prospective auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence, of the Public Company Accounting Oversight Board (United States) (the "PCAOB");

- Appointing, retaining, compensating and overseeing the work of the independent auditors (including resolving disagreements between management and the independent auditors regarding financial reporting) for the purpose of preparing or issuing an audit report or related work. The Audit Committee shall submit

its selection of the independent auditors to the Company's stockholders for their non-binding ratification on an annual basis;

- Pre-approving audit and permissible non-audit services provided to the Company by the independent auditors (or subsequently approving non-audit services in those circumstances where a subsequent approval is necessary and permissible); in this regard, the Audit Committee shall have the sole authority to approve the selection and termination of the independent auditors (which independent auditors shall report to the Audit Committee), all audit engagement fees and terms and all non-audit engagements, as may be permissible, with the independent auditors;

- Reviewing and discussing with the independent auditors any documentation supplied by the independent auditors as to the nature and scope of any tax services to be approved, as well as the potential effects of the provision of such services on the auditor's independence;

- Reviewing and providing oversight with respect to the external audit and the Company's relationship with its independent auditors by (i) reviewing the independent auditors' proposed audit scope, approach and independence for the annual audit and quarterly reviews for the current year; (ii) obtaining on a periodic basis a written statement from the independent auditors regarding relationships and services with the Company which may impact independence and presenting this statement to the Board, and to the extent there are relationships, monitoring and investigating them; (iii) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, changes in the Company's selection or application of accounting principles, any difficulties encountered in the course of the audit work, suggestions for improvements provided to management by the independent auditors, any restrictions on the scope of activities or access to requested information, any significant disagreements with management and any other required communications described in applicable accounting standards, significant new accounting policies and any other matters described in PCAOB AS 1301 – Communications with

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Audit Committees, as may be modified or supplemented; and (iv) reviewing reports submitted to the audit committee by the independent auditors in accordance with the applicable SEC requirements;

- Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," in connection with filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

- Engaging the Company's independent auditors to review, prior to filing with the SEC, the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

- Reviewing, prior to announcement, the Company press releases containing material financial information and discussing with management whether such press releases properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, applicable rules and regulations of the SEC governing the disclosure of such non-GAAP information;

- Overseeing compliance with the requirements of the SEC and the New York Stock Exchange for disclosure of auditor's services and audit committee members, member qualifications and activities;

- At least annually, obtaining and reviewing a report by the independent auditor describing the audit firm's internal quality-control procedures and any material issues raised by the most recent internal quality-control procedures and any material issues raised by the most recent internal quality-control, peer review or any inquiry or investigation by governmental or professional

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

authorities within the preceding two years, and any steps to deal with any identified issues;

- Discussing with management and the independent auditors correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies;

- Reviewing management's monitoring of compliance with the Foreign Corrupt Practices Act, the UK Anti-Bribery Act and any other similar laws;

- Annually reviewing and providing to the Board for its approval the Company's Code of Business Ethics and Conflict of Interest Policy for Directors, Officers and Key Employees, in accordance with applicable law;

- Reviewing annually the results of the annual Certification of the Code of Business Ethics and Conflict of Interest Policy For Directors, Officers and Key Employees with management, and the disposition of all instances of noncompliance as appropriate;

- Setting clear hiring policies for employees or former employees of the Company's independent auditors, consistent with SEC and the New York Stock Exchange regulations and guidelines;

- Reviewing and evaluating the lead partner of the independent auditor team and ensuring an orderly rotation of the lead audit partner as required by law;

- Reviewing with the independent auditors, as appropriate, communications between the audit team and the independent auditors' national office with respect to accounting or auditing issues presented by the engagement;

- Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- Reviewing and discussing with management and the independent auditor the Company's financial risk exposures (including its investment policies) and assessing the policies and processes management has implemented to monitor and control such exposures;

- Assisting the Board in fulfilling its oversight responsibilities regarding the Company's policies and processes with respect to enterprise risk assessment and management, including any significant non-financial risk exposures;

- If necessary, instituting special investigations with full access to all books, records, facilities and personnel of the Company;

- Obtaining advice and assistance from outside legal, accounting or other advisors, with any resulting expenses being paid by the Company;

- Reviewing in advance and approving all transactions between the Company and a related party for which review or approval is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings;

- At least annually, reviewing its own charter, structure, processes, and membership requirements and performing an annual self-evaluation of its performance;

- Providing a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting, internal accounting controls, auditing matters or related matters;

- Reviewing and advising the Chief Executive Officer and the Board with respect to the appointment, dismissal and

replacement of the chief financial officer (and chief accounting officer) and consulting with the Chief Executive Officer about the performance goals and subsequent performance evaluation and compensation of each;

- Reviewing the performance, and determining the scope, roles and responsibilities, of the Company's internal audit function, including: (i) assessing resource requirements (internal, external and/or combined); (ii) reviewing with management and the chief internal audit executive any Internal Audit Charter, audit plans, activities, staffing and organizational structure of the internal audit function; (iii) ensuring there are no unjustified restrictions or limitations on the chief internal audit executive; (iv) reviewing any significant reports to management prepared by the internal audit department, including management's adoption and resolution of the internal audit department's recommendations; (v) reviewing the effectiveness of the internal audit function annually as part of the year-end external audit and reporting process; and (vi) on a regular basis, meeting separately with the chief internal audit executive to discuss any matters that the Audit Committee or internal audit believes should be discussed privately;

- Reviewing and discussing with executive management, and recommending to the Board, the appointment or dismissal of the chief internal audit executive and consulting with executive management about his or her performance goals and subsequent performance evaluation and compensation, and the application of the Company's compensation policies to other internal audit personnel; and

- Any additional responsibility or authority mandated by the SEC, the New York Stock Exchange or other applicable rule or regulation. [Emphasis added].

29.    The purpose of the Audit Committee is to assist Arlo's Board in its oversight of accounting, financial reporting and disclosure processes and adequacy of systems of disclosure and internal controls.  The wrongful conduct of the Director Defendants complained of herein violates the Charter of the Audit Committee.

30.    The Board of Directors of Arlo are also charged with developing and maintaining the Company's corporate governance policies and any related matters required by the federal securities laws.   The wrongful conduct of the Director Defendants complained of herein violates good corporate governance principles.

## DUTIES OF THE DIRECTOR DEFENDANTS

31.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.   The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.   The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

32.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.   In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

33.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal

authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

34.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and

preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

35.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business opportunities, results, and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

**Background**

36.    Arlo is a provider of home security and monitoring systems. The Company's products include Wi-Fi- and LTE-enabled cameras, advanced baby monitors, and smart security lights.

37.    Arlo claimed to be the leader in the U.S. consumer network-connected camera-systems market, with a 48% market share as of the second quarter of 2018. The Company enjoyed a "firstmover" advantage, as one of the first companies to mass produce easy-to-install home security cameras and the integrated smart technologies that service the devices. As a result of its market dominance, purportedly superior product offerings, and focus on product innovation, the Company was able to charge a premium for its devices, with some of its security cameras selling for nearly double the price of its competitors' cameras.  At the same time, Arlo was facing rising competition from competitors such as Google and Amazon, who offer lower cost alternative smart security devices. Thus, it was critical to investors at the time of the IPO that the Company maintain its competitive

advantages, technological leadership, and ability to charge a price premium for its devices.

38.     On July 6, 2018, Arlo filed the Registration Statement on Form S-1, which, after amendments, was declared effective on August 2, 2018.  On August 6, 2018, the Company filed with the SEC the Prospectus on Form 424B4, which included and formed part of the Registration Statement. By means of the Registration Statement, the Company sold over 11.7 million shares of Arlo common stock (including the exercise of the underwriters' overallotment option) at a price of $16 per share for over $187 million in gross proceeds.

39.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

40.     Specifically, the Registration Statement highlighted the Company's "significant growth" and market leadership. The Registration Statement stated in pertinent part:

> We have experienced significant growth since the launch of our first product in December 2014, and according to NPD Group, Arlo is the leader in the U.S. consumer network connected camera systems market. Outside of the United States, we are also the leader in Australia and several major European markets.  In 2016, Arlo grew revenue by 108% over the prior year to $184.6 million, and in 2017, Arlo further grew revenue by 101% over the prior year to $370.7 million.

41.     The Registration Statement represented that the Company's growth would continue to be sustained through the launch of new devices and innovative technologies.  The Registration Statement stated in pertinent part:

> Since the launch of our first product in December 2014, we have shipped over 7.5 million smart connected devices, and, as of April 1, 2018, our smart platform had over 1.9 million registered users across more than 100 countries around the world. ***We plan to continue to***

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*introduce new smart connected devices to the Arlo platform in new categories, increase the number of registered users on our platform, keep them highly engaged through our mobile app and generate incremental recurring revenue by offering them paid subscription services*. [Emphasis added].

42.   Similarly, the Registration Statement claimed that Arlo's "leading technology" and its plan to "continue to introduce new smart connected devices" had positioned the Company to continue to maintain its competitive edge following the IPO.  The Registration Statement stated:

Arlo combines an intelligent cloud infrastructure and mobile app with a variety of smart connected devices that transform the way people experience the connected lifestyle.  Our cloud-based platform creates a seamless, end-to-end connected lifestyle solution that provides users visibility, insight and a powerful means to help protect and connect with the people and things that matter most to them.  Arlo enables users to monitor their environments and engage in real-time with their families and businesses from any location with a Wi-Fi or a cellular network internet connection. To date, we have launched several categories of award-winning smart connected devices, including wire-free smart Wi-Fi and LTE-enabled cameras, advanced baby monitors and smart security lights.   In addition, Arlo's broad compatibility allows the platform to seamlessly integrate with third-party internet-of-things ("IoT") products and protocols, such as Amazon Alexa, Apple HomeKit, Apple TV, Google Assistant, IFTTT, Stringify and Samsung SmartThings.  Since the launch of our first product in December 2014, we have shipped over 7.5 million smart connected devices, and, as of April 1, 2018, our smart platform had over 1.9 million registered users across more than 100 countries around the world.   *We plan to continue to introduce new smart connected devices to the Arlo platform in new categories, increase the number of registered users on our platform, keep them highly engaged through our mobile app and generate incremental recurring revenue by offering them paid subscription services*.

\* \* \*

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 20 -

*We believe that the combination of our leading technology and our decades of experience gained from operating within a highly successful consumer electronics company positions us well against the competition and to be successful as an independent company.*

\* \* \*

*Our technology leadership, embodied in our smart platform, has helped us achieve significant market share gain in the consumer network connected camera systems market.* According to NPD, for the second quarter of 2018, we held 48% market share based on dollar sales in the U.S. consumer network connected camera systems market, and our market leadership extends to international markets where we have introduced our products. *In addition to global expansion opportunities, we believe we are well-positioned to extend our current market leadership to the broader connected lifestyle market both within and beyond the home as we continue to launch new product lines and services within our connected lifestyle platform.* [Emphasis added].

43.     In addition, the Registration Statement stated that the Company's "Best-in-Class Technology" and its stable of engineers, who are "continually push[ing] the boundaries of innovation," were among its main "[c]ompetitive [a]dvantages." The Registration Statement stated:

*Our Competitive Advantages – What Sets Us Apart*

*Best-in-Class Technology*. Our engineers continually push the boundaries of innovation to develop products that leverage our cutting-edge technological capabilities. We are committed to hiring and retaining top engineers and thought leaders in the field.

44.     While the Registration Statement discussed possible competition, it claimed that Arlo was "well-positioned" to not only maintain its competitive advantage, but "extend [its] current market leadership" following the IPO because of the Company's "new product lines and services." The Registration Statement stated:

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Competition**

According to NPD, for the second quarter of 2018, we held 48% market share based on dollar sales in the U.S. consumer network connected camera systems market. Outside of the United States, we are also leaders in Australia and several major European markets. ***We believe we are well-positioned to extend our current market leadership to the broader connected lifestyle market both within and beyond the home as we continue to launch new product lines and services within our smart platform***. However, our market is highly competitive and evolving, and we expect competition to increase in the future. We believe the principal competitive factors impacting the market for our products include price, service offerings, functionality, brand, technology, design, distribution channels and customer service.

***We believe that we compete favorably in these areas on the basis of our U.S. consumer network connected camera systems market leadership position, best-in-class technology, direct relationship with users and user engagement, trusted Arlo platform, strong Arlo brand and channel partners and deep strategic partnerships with key suppliers, such as Broadcom, Inc., OmniVision Technologies Inc. and Qualcomm Incorporated. Moreover, our focus on building a connected lifestyle platform, combined with our leading market share in the consumer network connected camera systems market, has led to the strength of our Arlo brand worldwide. We believe this focus allows us to compete favorably with companies that have introduced or have announced plans to introduce devices with connected lifestyle functionalities***. [Emphasis added].

45.     Not only did the Registration Statement claim that Arlo's technological advantages and market dominance would grow following the IPO, the Registration Statement also stated that the Company's ability to "continue to charge a premium price over competing products" was a key component of this "[g]rowth [s]trategy." The Registration Statement stated:

***Our Growth Strategy***

We primarily generate revenue by selling devices through retail, wholesale distribution and wireless carrier channels and subscription

services through in-app purchases. A user's introduction to our smart platform typically starts with the purchase of one or more of our cameras and lights, with a typical registered user owning on average three Arlo devices. ***We believe that we can continue to charge a premium price over competing products because of our superior product features, ease of use and bundled prepaid services, such as rolling seven-day cloud video storage.*** We further enhance the user experience by offering our subscription-based Arlo Smart services, which include features such as person detection, rich app notifications and extended data storage. Since the launch of the original Arlo Security Camera in December 2014, we have introduced six additional Arlo devices, and we plan to continue to launch new camera and non-camera products and services to the Arlo ecosystem and grow our user and subscriber bases. [Emphasis added].

46.     In addition, the Registration Statement touted Arlo's purported expertise in battery development for its devices.   For example, the Registration Statement highlighted the Company's "power management expertise" as one of "three key technology differentiators."   Specifically, the Registration Statement stated:

Our proven power management expertise, leveraged from NETGEAR's years of experience building mobile hotspots, encompasses hardware product design, software and firmware, including patented beaconing and power management methods, to prolong battery life.

\* \* \*

***Our Competitive Advantages – What Sets Us Apart***

***Best-in-Class  Technology***. Our  engineers  continually  push  the boundaries of innovation to develop products that leverage our cutting-edge technological capabilities.

We are committed to hiring and retaining top engineers and thought leaders in the field.

\* \* \*

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- • **_Power Management Expertise_**. Arlo's power management expertise, encompassing hardware product design, software and firmware, minimizes power consumption in our devices. Motion-activated on/off sensors prolong the devices' overall battery life, and our patented low-power Wi-Fi technology also minimizes battery usage before and during video transmission. As a result, our users typically only need to recharge their Arlo devices every three to six months, leading to flexible indoor and outdoor placement options.

47.    Moreover, the Registration Statement highlighted the importance to Arlo of ensuring that its new products were timely launched for the critical holiday shopping season.  The Registration Statement stated:

**_Seasonality_**

Historically, we have generated higher revenue in the third and fourth quarters of each year compared to the first and second quarters due to seasonal demand from consumer markets primarily relating to the beginning of the school year and the holiday season. For example, for the years ended December 31, 2017 and 2016, our third and fourth quarters collectively represented 62.0% and 65.5%, respectively, of our revenue for such years. **_Therefore, timely and effective product and service introductions are critical to our results of operations_**. [Emphasis added].

48.    The statements in ¶¶ 38-47 were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO:

(a)    Arlo was suffering from adverse sales trends in its key security camera products;

(b)    Arlo's flagship products had begun the end of their sales cycle and the Company had failed to develop new products to replace them or to effectively compete with alternative products being offered by the Company's rivals;

(c)     Arlo needed to engage in aggressive promotional activity and cut prices in order to maintain sales growth and stave off competition from well-resourced rivals, such as Google and Amazon, with significantly cheaper product offerings;

(d)     Arlo's new flagship wire-free security camera system, Arlo Ultra, suffered from quality control issues with its batteries that jeopardized the Company's ability to launch the product in time for the crucial holiday season; and

(e)     as a result of (a)-(d) above, the Company was experiencing extreme margin pressures, had lost its ability to maintain its historical price premium, and was suffering from accelerating negative sales and operational trends.

49.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."   The failure of the Registration Statement to disclose the adverse sales trends and need to engage in substantial promotional activity to continue sales growth (thereby eroding the Company's margins) violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed trends would (and did) have an unfavorable impact on the Company's net sales, revenues and income from continuing operations.   This failure also violated 17 C.F.R. § 229.503(c), because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Arlo shares speculative or risky.   To

the contrary, the Registration Statement contained boilerplate discussions of possible future issues but failed to disclose that these risks had already materialized. For example, the Registration Statement misleadingly discussed the risks that "may" occur "if" Arlo experienced product delays or received defective supplier parts but failed to disclose that the Company's flagship product under development, the Arlo Ultra camera, suffered from quality control problems and battery defects.

50.     On October 25, 2018, the Company issued a press release announcing its financial results for the quarter ended September 30, 2018 – the same quarter during which Defendants had conducted the IPO.  Arlo announced that its GAAP gross margin had shrunk to 22.7% during the quarter, down from 25.5% the prior quarter and 27% in the comparable quarter the prior year.  The press release also provided a dismal outlook for the Company's fourth quarter of 2018, with a projected GAAP gross margin of only 12.4% to 14.4% – or approximately half the Company's gross margin achieved in the quarter just prior to the IPO.  At the same time, the Company forecast revenues of only $140 million to $155 million for the quarter, which represented a slight increase over the $131.2 million in quarterly revenues achieved in the third quarter of 2018, despite the fact that the Company historically attained substantially higher revenues during the fourth quarter due to the holiday shopping season.

51.     That same day, Arlo hosted an earnings conference call to discuss the results. In response to an analyst's question about the concerning contraction in Arlo's gross margins, Gorjanc stated that the sharp decline was due to the high level of promotional activity the Company needed to engage in to promote sales. In addition, Gorjanc stated that the promotional activity was necessary because Arlo had failed to bring a new product to market and the available products being sold by the Company were later in their sales cycle, and thus less desirable to consumers. The following is an excerpt from the exchange:

**Analyst**: I guess I'm a little surprised to see revenue growth not accelerating with that level of gross margin decline. Is there a reason that we wouldn't – why would revenue growth be decelerating year-over-year with such a decline in gross margin year-over-year?

**Gorjanc**: So really, the majority of that promotion is that some of the products have been out there for quite a while, and we don't have a big new one hitting in channel all of Q4 like we would normally have, like we had Pro 2 last year, I think introduced in September. And I would say, that's really the main reason.

52.    Later in the call, as analysts continued to express surprise over the need for Arlo to engage in such aggressive promotional activity, Gorjanc stated that she was "a little bit exasperated by, again, the product line being a little bit older. If I have a brand new product out in Q4, you can bet I'm not going to be promoting that."

53.    Then, on December 3, 2018, the Company reported a delay in shipments of its new flagship wire-free security camera system, Arlo Ultra, due to a quality issue in the device's battery component. The defective cameras had been under development for months, including at the time of the IPO. In light of the increasing competitive pressures faced by Arlo from lower priced alternatives, the failure of the Arlo Ultra to timely launch was a material adverse development for the Company. As a result of the delay, the Company also lowered its fourth quarter 2018 financial guidance, with "net revenue to be in the range of $125 million to $130 million, non-GAAP gross margin to be approximately 10%, and non-GAAP operating loss to be approximately 20% of revenue." As a result, the Company's revenues were actually projected to *decline* sequentially from the prior quarter, despite the impact of the holiday shopping season and the Company's planned promotional activities. Furthermore, the Company's gross margins during the fourth quarter were expected to be a fraction of what they had been just prior to the IPO.

54.   On December 4, 2018, Arlo stock closed at $8.80 per share, *or 45% less* than the price at which certain Defendants had sold Arlo stock in the IPO only four months previously.

## THE TRUTH BEGINS TO EMERGE

55.   On December 3, 2018, the Company reported a delay in shipments of Ultra, citing "a quality issue with the battery from one of its suppliers" that was discovered during the product's final testing phase.  As a result of the delay, Ultra also lowered its fourth quarter 2018 financial guidance, advising investors that it anticipated "net revenue to be in the range of $125 million to $130 million, non-GAAP gross margin to be approximately 10%, and non-GAAP operating loss to be approximately 20% of revenue."

56.   Following this news, the Company's stock price fell $2.75 per share, or 22.86%, to close at $9.28 on December 3, 2018.  This constituted a decline of $6.72, or approximately 42%, from the IPO price of $16.00 per share.

## DAMAGES TO ARLO

57.   As a result of Defendants' improprieties, the Company failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO: (a) Arlo was suffering from adverse sales trends in its key security camera products; (b) Arlo's flagship products had begun the end of their sales cycle and the Company had failed to develop new products to replace them or to effectively compete with alternative products being offered by the Company's rivals; (c) Arlo needed to engage in aggressive promotional activity and cut prices in order to maintain sales growth and stave off competition from well-resourced rivals, such as Google and Amazon, with significantly cheaper product offerings; (d) Arlo's new flagship wire-free security camera system, Arlo Ultra, suffered from quality control issues with its batteries that jeopardized the Company's ability to launch the product in time for the crucial holiday season; and (e) as a result of (a)-(d) above, the Company was experiencing extreme margin pressures, had lost its ability to

maintain its historical price premium, and was suffering from accelerating negative sales and operational trends.

58.     Arlo's performance issues also damaged its reputation within the business community and in the capital markets. Arlo's current and potential investors consider a company's trustworthiness and ability to accurately value its business prospects and evaluate sales and growth potential.  Arlo's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by Defendants have materially increased the perceived risks of investing in and lending money to the Company.

59.     Further, as a direct and proximate result of Defendants' actions, Arlo has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     the costs incurred from defending and the payment of $1,250,000 to settle *Wong v. Arlo Technologies, Inc., et. al.*, Case No. 19-cv-00372-BLF (N.D. Cal.) ("Federal Securities Class Action"); and

(b)     the costs incurred from defending and paying any settlement in an action brought under Section 11 of the Securities Act of 1933 entitled *In re Arlo Shareholder Litig.*, Lead Case No. 18CV339231 (Sup. Ct. Cal., County Santa Clara) (the "State Section 11 Class Action").

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

60.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 21D of the Exchange Act.

61.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

62.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.

63.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

64.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.

65.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

63.    At the time Plaintiff filed this derivative action, the Company Board was comprised of seven (7) members – Aggrawal, Carter-Miller, Faison, McRae, Pope, Summers, and Rothstein.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

64.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

65.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Amended Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 30 -

66.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

67.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

68.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant McRae**

69.     Defendant McRae is not disinterested or independent, and therefore, is incapable of considering demand because Defendant McRae (as CEO of the Company) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  For example, for the year 2019 and 2020, Defendant McRae received the following:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2020 | $778,846 | $3,343,921 | $--- | $378,546 | $4,338 | $4,505,651 |
| 2019 | $750,000 | $1,471,966 | $--- | $187,500 | $5,200 | $2,414,666 |

70.     Defendant McRae had also the opportunity to earn a target annual performance bonus equal to 100%, 70% and 50% of his annual base salary, respectively.

71.     As such, McRae cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

72.     According to the Company's Proxy, dated June 14, 2019, "McRae is not considered independent because he is an executive officer of the Company."

73.     This lack of independence and the financial benefits received by Defendant McRae renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

74.     In addition, McRae is a defendant in the Federal Securities Class Action.

75.     Defendant McRae is also a defendant in the **active** State Section 11 Class Action.

76.     As such, Defendant McRae cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Carter**

77.     Defendant Carter is a defendant in State Section 11 Class Action.

78.     As such, Defendant Carter cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability.

**Defendant Faison**

79.     Defendant Faison is a defendant in the State Section 11 Class Action.

80.     As such, Defendant Faison cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability.

**Defendant Summers**

81.     Defendant Summers is a defendant in State Section 11 Class Action.

82.   As such, Defendant Summers cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability.

**Defendants Pope, Summers, Miller and Aggarwal**

83.   Defendants Pope, Summers, Miller and Aggarwal served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the purposes of the Audit Committee are to assist the Board in fulfilling its oversight responsibilities related to:

- ***The accounting and financial reporting*** processes of the Company and audits of the financial statements of the Company;

- ***The integrity of the Company's financial statements***; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications, independence, performance, and compensation; and the Company's internal controls over financial reporting and disclosure controls and procedures;

- The preparation and approval of the reports that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement;

- ***The Company's internal audit function***;

- Transactions between the Company and a related party; and

- The application of the Company's Code of Business Ethics and Conflict of Interest Policy for Directors, Officers and Key Employees as established by the Board.

84.   Defendants Pope, Summers, Miller and Aggarwal breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious issues and

1  deficiencies discussed herein.   Thus, Defendants Pope, Summers, Miller and

2  Aggarwal face a substantial likelihood of liability for their breach of fiduciary duties

3  and any demand upon them is futile.

4  **Defendants Carter, Faison, Summers and McRae**

5       85.   Defendants Carter, Faison and Summers served on the Board of

6  directors of NETGEAR.

7       86.   Defendant McRae served as NETGEAR's Senior Vice President of

8  Strategy since October 2017.

9       87.   Prior to the consummation of the Company's initial public offering in

10 August 2018, Arlo operated as an operating segment of NETGEAR.  On December

11 31, 2018, NETGEAR completed the spin-off of Arlo by means of a special stock

12 dividend of 62,500,000 shares of our common stock that had been owned by

13 NETGEAR to NETGEAR stockholders of record as of the close of business on

14 December 17, 2018.  The distribution of the special stock dividend was made on

15 December 31, 2018.  Prior to the Distribution, NETGEAR owned approximately

16 84.2% of the outstanding shares of Arlo common stock.

17      88.   As a result of the prior business relationships among Defendants Carter,

18 Faison, Summers and McRae, they are unable to evaluate a demand with

19 independence, and therefore, demand is excused.

20 **COUNT I**

21 **(Against The Director Defendants For Breach Of Fiduciary Duty)**

22      89.   Plaintiff incorporates by reference and realleges each and every

23 allegation contained above, as though fully set forth herein.

24      90.   The Director Defendants owe the Company fiduciary obligations.  By

25 reason of their fiduciary relationships, the Director Defendants owed and owe the

26 Company the highest obligation of good faith, fair dealing, loyalty, and due care.

27      91.   The Director Defendants violated and breached their fiduciary duties of

28 care, loyalty, reasonable inquiry, and good faith.

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

92.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to make false and misleading statements in the Registration Statement about the Company's business performance and failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls as alleged herein.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

93.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

94.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending multiple securities lawsuits, costs associated with settling one securities lawsuit, severe damage to the share price of the Company, all resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against The Director Defendants For Waste Of Corporate Assets)

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     The wrongful conduct alleged regarding the issuance of false and misleading statements and its failure to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls was continuous, connected, and on-going throughout the Relevant Period.   It resulted in continuous, connected, and ongoing harm to the Company.

97.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

98.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

99.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

## (Against Defendants For Unjust Enrichment)

100.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

101.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

102.    Defendants received unjustly lucrative payment tied to the false and misleading statements, or received fees and stock awards, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company stock.  For example:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Total ($) |
|---|---|---|---|---|
| Faison | $107,259 | $180,000 | --- | $287,259 |
| Carter-Miller | $56,262 | $180,000 | --- | $236,262 |
| Summers | $61,119 | $180,000 | --- | $241,119 |
| Pope | $53,588 | $180,000 | --- | $233,688 |
| Aggarwal | $60,724 | $180,000 | --- | $240,724 |
| Rothstein | $36,495 | $180,000 | --- | $216,495 |

103.    Plaintiff, as a shareholder and a representative of Arlo, seeks restitution from these Defendants and seeks an order from this Court disgorging all profits—

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

including any performance-based or valuation-based compensation—obtained by Defendants due to their wrongful conduct.

104.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

### (Against Defendant McRae For Violations Of Sections 10(b) And 21D Of The Exchange Act)

105.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.   The Company, along with Defendant McRae, were named as defendants in the Federal Securities Class Action, which asserted claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  The defendants in the Federal Securities Class Action recently settled the action, agreeing to pay $1,250,000 in cash.  The Company's liability was in whole or in part due to Defendant McRae's willful and/or reckless violations of his obligations as an officer and director of the Company.

107.   Through his position of control and authority as an officer of the Company, Defendant McRae was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Federal Securities Class Action and herein.

108.   The Company has now settled the claims against it for violating the federal securities laws, thus Company's liability arose in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendant McRae as alleged herein, who caused the Company to suffer substantial harm through his disloyal acts.  The Company is entitled to contribution and indemnification from Defendant McRae in connection with all claims that were asserted in the Federal Securities Class Action, and those claims that continue to be asserted in the State Section 11

Class Action, which have been, are, or may continue to be asserted against the Company by virtue of his wrongdoing.

109.   As an senior officer and director, Defendant McRae had the power or ability to, and did, control or influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that caused the violations of law set forth in the Federal Securities Class Action and the State Section 11 Class Action.

110.   Defendant McRae is liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

111.   Defendant McRae has damaged the Company and is liable to the Company for contribution.

112.   No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)   Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)   Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)   Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)   Awarding contribution against the Defendant McRae and in favor of the Company for the damages suffered by the Company;

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     (E)    Awarding Plaintiff the costs and disbursements of this action, including

2 attorneys', accountants', and experts' fees; and

3     (F)    Awarding such other and further relief as is just and equitable.

4                  **<u>JURY TRIAL DEMANDED</u>**

5    Plaintiff hereby demands a trial by jury of all issues so triable.

6 Dated: May 24, 2021

**MAGNANIMO & DEAN, LLP**

By: */s/ Frank A. Magnanimo*
    Frank A. Magnanimo
21031 Ventura Boulevard
Suite 803
Woodland Hills, CA 91364
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Frank@MagDeanLaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

Of Counsel:
**MOORE KUEHN, PLLC**
Fletcher Moore, Esq.
30 Wall Street, 8th Floor
New York, NY 10005

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**